1173702-3

KOBAYASHI, SUGITA & GODA
CRAIG SHIKUMA, 4018
JESSE W. SCHIEL, 7995
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813-3889
Telephone: (808) 539-8700
Fax: (808) 539-8799
Email: cshikuma@ksglaw.com
        jschiel@ksglaw.com

Attorneys for Plaintiff
ONEWEST BANK, FSB

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ONEWEST BANK, FSB,<br><br>                    Plaintiff,<br><br>         vs.<br><br>J. RANDALL FARRAR;<br>CHRISTOPHER SALEM; WAYNE<br>WAGNER; MARY WAGNER; LOT<br>48A LLC; POOL PRO, INC.;<br>CREDIT ASSOCIATES OF MAUI,<br>LTD; JOHN and MARY DOES 1-20;<br>DOE PARTNERSHIPS,<br>CORPORATIONS, OR OTHER<br>ENTITIES 1-20,<br><br>                    Defendants. | CIVIL NO. CV 12-00108 ACK-KSC<br>(Foreclosure)<br><br>FINDINGS AND RECOMMENDATION<br>GRANTING PLAINTIFF ONEWEST<br>BANK, FSB'S MOTION TO ENFORCE<br>SETTLEMENT AGREEMENT<br><br><br><br><br><br><br><br><br>Trial Date: **November 13, 2013** |

## FINDINGS AND RECOMMENDATION GRANTING PLAINTIFF ONEWEST BANK, FSB'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

Before the Court is Plaintiff OneWest Bank, FSB's ("**Plaintiff**") Motion to Enforce Settlement Agreement, filed on October 1, 2013 ("**Motion to Enforce**"). Plaintiff requests that the Court enforce the Parties' settlement agreement that was placed on the Court's record on August 26, 2013 (the "**settlement on the record**") by ordering Defendant Christopher Salem ("**Salem**") to: (1) execute the finalized version of the written agreement memorializing the terms and conditions in the settlement on the record (the "**Final Settlement Agreement**"), which was circulated to the Parties on September 18, 2013, and which is attached to Plaintiff's Motion to Enforce as Exhibit R; (2) execute and deliver to Plaintiff the documents attached as Exhibits 1, 2, 3, 4, 6 and 8 to the Final Settlement Agreement; (3) show proof of funds (including a representation that the funds are not from the Bankruptcy Estate) for the payments Salem agreed to make under the settlement on the record; (4) pay to Wayne and Mary Wagner the agreed upon sum of $50,000.00 for their release of lien on the Hui Road Property; and (5) pay Plaintiff the agreed upon sum of $575,000 for the Lower Road Property.

Plaintiff also requests that the Court exercise its inherent powers and sanction Salem for his bad-faith conduct and the unnecessary delays he caused in this action by ordering Salem to pay Plaintiffs' attorneys' fees and costs incurred in bringing its Motion to Enforce.

On October 8, 2013, Salem filed his Opposition, and on October 10, 2013, Plaintiff filed its Reply.  No other pleadings were filed by any of the other parties in this action.  This matter came on for hearing before the Court on October 15, 2013 at 9:32 a.m.  Craig Shikuma, Esq. and Jesse Schiel, Esq. appeared on behalf of Plaintiff, Kurt Leong, Esq. appeared on behalf of Defendant J. Randall Farrar ("**Farrar**"), and David Cain, Esq. appeared telephonically on behalf of Salem.

This Court is very familiar with the settlement in this matter, having conducted several settlement conferences with the Parties.  Accordingly, taking judicial notice of the settlement on the record, and based on said record and this Court's knowledge of past settlement conferences held by this Court, after careful consideration of the Motion to Enforce, the supporting and opposing memoranda, declarations and exhibits attached thereto, the arguments of counsel, and the record in this action, the Court HEREBY FINDS AND RECOMMENDS that Plaintiff's Motion be GRANTED IN FULL.

## BACKGROUND

This action arises out of two loans that Defendants Salem and Farrar obtained from La Jolla Bank, FSB ("**La Jolla**"), which were secured by two mortgages for each loan on two pieces of residential property.

The first loan (the "**Lower Road Loan**") was for nine hundred ninety thousand dollars ($990,000.00) and was made for the purpose of acquiring a single

family residence located at 5106 Lower Honoapiilani Road, Lahaina, Hawaii (the "**Lower Road Property**").  Both Salem and Farrar executed and delivered a promissory note, dated August 14, 2008, payable to La Jolla in connection with the Lower Road Loan (the "**Lower Road Note**").

The second loan (the "**Hui Loan**") was for one million, five hundred sixty thousand dollars ($1,560,000.00) and was a refinance of an existing loan for a home located at 8 Hui Road E. Lahaina, Hawaii (the "**Hui Property**").  On or about August 14, 2008, Salem and Farrar executed and delivered a second promissory note in the amount of one million, five hundred sixty thousand dollars ($1,560,000.00), payable to La Jolla in connection with the Hui Loan (the "**Hui Note**").

The Lower Road Loan is secured by two mortgages (one on the Lower Road Property and one on the Hui Property) in favor of La Jolla that were recorded in the Bureau of Conveyances for the State of Hawaii ("**Bureau**") on August 14, 2008 (the "**Lower Road Mortgages**").  Likewise, the Hui Loan is also secured by two mortgages (one on the Hui Property and one on the Lower Road Property) in favor of La Jolla that were recorded in the Bureau on August 14, 2008 (the "**Hui Mortgages**").

The Hui Note, Hui Mortgages, Lower Road Note and Lower Road Mortgages, and related loan documents, were assigned to Plaintiff in 2010 pursuant

to a Purchase and Assumption Agreement with the Federal Deposit Insurance Corporation, as Receiver for La Jolla, to purchase certain assets and certain limited liabilities formerly belonging to La Jolla.

On January 24, 2012, Plaintiff filed a Complaint in the Circuit Court of the Second Circuit (the "**Complaint**") against Salem and Farrar, Wayne and Mary Wagner ("**Wagners**")[1] and other defendants, relating to the foreclosure of the Hui Mortgages and Lower Road Mortgages.  Salem removed the action to this court on March 12, 2012 (the "**Lawsuit**").

On December 19, 2012, Plaintiff filed a Motion for Summary Judgment seeking a decree of foreclosure in connection with the Complaint.  See Pl.'s Mot. for Summ. J., etc. (Dec. 19, 2012) (CM/ECF Doc. No. 65).  Salem subsequently filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, District of Hawaii (the "**Bankruptcy Proceeding**") resulting in an automatic stay of the Lawsuit.  See In re Salem, Case No. 13-00392 (Bnkr. Haw. Dec. 19, 2012).

Plaintiff obtained relief from the automatic stay in the Bankruptcy Proceeding on June 17, 2013, which terminated the automatic stay and authorized Plaintiff to continue to foreclose on the Hui Mortgages and Lower Road

---

[1] The Wagners are junior lienholders who claim an interest in the Hui Property and Lower Road Property by virtue of mortgages on the Hui Property and Lower Road Property that were recorded in the Bureau in August 2009.

Mortgages.  See Order Granting Pl.'s Mot. for Relief from the Automatic Stay

Under 11 § 362 (Real Property) or, in the Alternative, Adequate Protection (June

17, 2013) (Bankruptcy Dkt. # 72).

On August 26, 2013, Plaintiff, Salem and Farrar[2] participated in a settlement

conference with this Court and agreed to settle the Lawsuit pursuant to the

following terms that were placed on the Court's record at the conclusion of the

settlement conference:

1. The Parties are to execute a written settlement agreement (the
   "**Settlement Agreement**") within 14 days from August 26, 2013;

2. There will be a global settlement among the Parties;

3. Salem shall execute a deed in lieu of foreclosure for the Hui property
   free and clear of all liens, including the Wagner Mortgage, the Lot
   48a[3] liens and any other liens on the property, except for the OneWest
   mortgages;

4. The Wagners release any and all claims against OneWest et al. in
   connection with this foreclosure case;

5. The Wagners release Dr. Farrar personally and release their lien on
   the Hui Road property in exchange for (i) payment of $50,000.00
   from Salem and (ii) Dr. Farrar's release of all interest in the Hui Road
   and Lower Road properties;

---

[2] Though the Wagners were not present at the settlement conference, they
participated in the drafting of the Settlement Agreement, and consented to the
terms set forth therein.

[3] Lot 48a is another Defendant and junior creditor in the lawsuit.

6. Salem must pay $575,000 to OneWest on the loan for the Lower Road Property;

7. Salem shall deliver a release of the Lot 48A liens by the hearing date on OneWest's Motion in Bankruptcy Court to approve the Settlement Agreement ("**Bankruptcy Motion**");

8. Salem must provide proof of funds for payment to OneWest for the Lower Road property, and a representation that such funds and the funds for the release of the Lot 48A liens and the Wagner mortgage are not from Salem's Bankruptcy Estate, at time of execution of the Settlement Agreement;

9. OneWest will issue 1099s to Salem and Farrar for the Hui and Lower Road Properties;

10. Salem shall file a withdrawal of his opposition to OneWest's Motion for Summary Judgment ("**MSJ**").  The Parties will stipulate to continue MSJ hearing date and all trial deadlines;

11. The Parties will execute a stipulated decree of foreclosure order and judgment for the Hui Property, which OneWest can file if Salem fails to fulfill the terms of the Settlement Agreement, including failing to clear the Lot 48A liens on Hui;

12. Salem, Farrar and the Wagners release any and all claims they have or may have against OneWest and/or the FDIC, and any respective affiliates, representatives, attorneys, etc., relating to the subject loans and/or the Hui and Lower Road Properties, and any claims they could have filed in the foreclosure action or Salem's bankruptcy proceeding, existing from the beginning of time to the date of the settlement. The release would include, but not be limited to, Salem's potential counterclaims, and all of his complaints and demands to governmental agencies regarding OneWest, the FDIC or the Hui Property;

13. As to sole exception to the release in paragraph 12, above, Salem shall have the right to pursue an administrative claim with the FDIC as receiver pursuant to 12 USC § 1821(d) for monies the FDIC may recover from third parties for acts or omissions by La Jolla Bank and/or its officers, directors, employees and agents;

14. OneWest will waive its deficiency rights against Salem and Farrar;

15. The settlement is subject to Bankruptcy Court approval; and

16. OneWest will file its Bankruptcy Motion to approve the Settlement Agreement.

See Exhibits A and B to Pl.'s Mot. to Enforce (Oct. 1, 2013) (CM/ECF Doc. No. 156); see also Decl. of Craig K. Shikuma ("**Shikuma Decl.**") ¶¶ 4-6, attached to Pl.'s Mot. to Enforce.  This Court specifically found that settlement on the record constituted a valid and enforceable agreement, and also retained jurisdiction to enforce the settlement on the record:

> Case settled. The essential terms of the settlement are set out in Exhibits 1, 2, and 3[,] which will be made a part of the record. The Court finds that the essential terms of a valid and enforceable settlement agreement have been set out in Exhibits 1, 2, and 3 and as noted on the record. . . .
>
> The Court retains jurisdiction to enforce the terms of the settlement.

Mins. (Aug. 26, 2013) (Doc. No. 140).  In addition, in response to this Court's direct questioning, Salem confirmed his agreement with the terms and conditions in the settlement on the record:

> THE COURT:   Mr. Salem, you've had a chance to review Exhibits, 1, 2 and 3?
>
> MR. Salem:  Yes, Your Honor.
>
> THE COURT:   Are all of the terms and conditions as stated out in 1, 2, and 3 acceptable to you?
>
> MR. SALEM:  Yes, Your Honor.

Exhibit X, at 3 attached to Pl.'s Mot. to Enforce.

Immediately following the August 26 settlement conference, Plaintiff, Farrar and the Wagners began working on drafting the Settlement Agreement and working out the details and mechanics necessary to carry into effect the terms and conditions of the Parties' settlement on the record.  See Decl. of Jesse W. Schiel ¶ 5, attached to Pl.'s Mot. to Enforce.  Plaintiff contends, and Salem does not appear to dispute, that Salem did not participate in the drafting of the Settlement Agreement, despite Salem's counsel being included on all email correspondence between Plaintiff, Farrar and the Wagners throughout the negotiations.  See id. ¶¶ 5-10; see also Exhibits C – E, attached to Pl.'s Mot. to Enforce.

The Court held another status conference on September 11 to ascertain the Parties' progress toward finalizing the settlement documents.  At this settlement conference, Salem represented that he would comply with the settlement on the record and that he was meeting with his attorney to go over the Settlement Agreement which had been circulated among the Parties.  Plaintiff maintains that

after the September 11 status conference, however, Salem made a number of untimely and belated objections and comments to the Settlement Agreement.  See Shikuma Decl. ¶¶ 10-11.  Salem does not dispute this allegation.  See generally Def. Salem's Opp'n to Pl.'s Mot. to Enforce (Oct. 8, 2013) (CM/ECF Doc. No. 161) ("**Opposition**").

After receiving Salem's objections and comments, Plaintiff's counsel asked Salem's counsel to provide a redline of the Settlement Agreement with specific changes rather than sending separate emails with Salem's comments and/or objections.  Shikuma Decl. ¶ 12.  Salem does not dispute that he did not provide the requested redline changes to the Settlement Agreement.  Id. ¶¶ 12-19.  Instead, it appears that Salem continued to make objections and/or comments to the Settlement Agreement in the form of emails and a letter.  See id. ¶ 19; see also Exhibit O attached to Pl.'s Mot. to Enforce.

On September 18, 2013, Plaintiff circulated a final version of the Settlement Agreement in the form agreed among Plaintiff, Farrar and the Wagners (the "**Final Settlement Agreement**") together with its accompanying exhibits.  See Exhibit R attached to Pl.'s Mot. to Enforce.  Plaintiff also sent an email to Salem's counsel setting forth Plaintiff's position regarding the Final Settlement Agreement:

> David, Michael,
> I sent via separate emails redlined and clean versions of the final Settlement Agreement and Exhibits "1" – "10".

**It is OWB's position that the Settlement Agreement and Exhibits that were sent are entirely consistent with the terms of the binding settlement placed on the court's record**.  Indeed, counsel for Farrar and the Wagners **have agreed to the form of these documents**.

My office has sent you the prior drafts of these documents, asked you for a redlined version with Mr. Salem's changes and copied you on emails with counsel for Farrar and the Wagners relating to the documents. Thus, **you should be familiar with the documents, including the revisions to drafts that were proposed, rejected and agreed to among counsel for OWB, Farrar and the Wagners**.  OWB therefore requests that you confirm by noon today whether Mr. Salem will execute the final Settlement Agreement and Exhibits (where his signature is required), provide the proof of funds as required by the Settlement Agreement, and pay the $575,000 in accordance with the terms of the Settlement Agreement.  **If I do not receive confirmation by that date/time, OWB will consider its remedies, including seeking a further conference with Judge Chang and/or filing a motion to enforce the settlement and for its attorneys' fees and costs**.

Under the present circumstances, OWB believes the above request is warranted and reasonable.  I sincerely hope that Mr. Salem will confirm, sign and perform; and that we can avoid further proceedings before Judge Chang.

Thank you.

Exhibit S to Pl.'s Mot. to Enforce (emphases in original); see also Shikuma Decl. ¶ 24.

Salem did not execute the Final Settlement Agreement and therefore Plaintiff requested another status conference with this Court, which was held on September 19, 2013.  At this status conference, Salem acknowledged receiving the

Final Settlement Agreement, but told the Court that he needed more time to review the agreement and the attached exhibits (Exhibits 1-10).  See Mins. (Sept. 19, 2013) (Doc. No. 148).  Based on Salem's representations, the Court granted Salem until September 23, 2013 to either execute the Final Settlement Agreement or submit a final redline to the Parties for review.  Id.

Plaintiff argues that after the September 19 status conference, Salem did not comply with the Court's instructions to either execute the Final Settlement Agreement, or provide a redline thereof, but that Salem instead provided an entirely new settlement agreement (the "**Salem Agreement**").  See Pl.'s Mot. to Enforce, at 6-7; see also Exhibit U and V to Pl.'s Mot. to Enforce.  Salem, on the other hand, maintains that the allegations that he refused to execute the Final Settlement Agreement are untrue because the Salem Agreement constitutes a "very clear and concise revision to the Draft Settlement Agreement."  Opposition, at 6.  Salem also suggests that he didn't need to provide a redline of his changes to the Final Settlement Agreement because Plaintiff "generated a redline compare version to their Draft Settlement Agreement and the requested changes were clear and evident."  Id.

According to Plaintiff, the Salem Agreement "contains numerous provisions that are contrary to the settlement on the record and/or significantly alter the terms/conditions the Parties agreed to."  Pl.'s Mot. to Enforce, at 6-7.  For

example, Plaintiff points out that the Salem Agreement adds the Federal Deposit Insurance Corporation ("**FDIC**") as a party to the agreement, which Plaintiff argues was never something the Parties discussed, much less agreed to.  See id. at 7.  Plaintiff also notes that the Salem Agreement is contrary to the settlement on the record in that it "also does not require the Parties to execute a stipulated decree of foreclosure and judgment for the Hui Road Property" and expands the scope of "the Borrower's and the Wagners' release, the provision for a form 1099 for the Hui Road property, [and] OneWest's remedies for the Borrowers' default on the settlement . . . ."  Id.  The Shikuma Declaration attached to Plaintiff's Motion to Enforce provides further details regarding the additional terms and conditions in the Salem Agreement which Plaintiff maintains "the Parties did not agree to at the settlement conference . . . ."  Shikuma Decl. ¶¶ 28(a)-(d).

Salem does not dispute that he added new terms and conditions to the Salem Agreement; rather, he states in a conclusory fashion that the "bulk of the language [in the Salem Agreement] is identical to Attorney Shikuma's without the continuous redundant references and confusing run on sentences."  Opposition, at 6.  Again, without addressing Plaintiff's arguments, Salem also states in a conclusory fashion that the Salem Agreement is a "far more user friendly document."  Id.

In an attempt to allow Salem the opportunity to clarify his alleged issues with the Settlement Agreement, the Parties held a teleconference on October 7, 2013.  Opposition, at 7; Pl.'s Reply to Opposition, at 3 (Oct. 10, 2013) (CM/ECF Doc. No. 166) ("**Reply**").  Salem construes this meeting as a "productive step towards executing a Final Settlement Agreement," and alleges that the Parties "agreed to an open dialogue and further editing of the Draft Settlement on the few remaining unresolved conditions."  Opposition, at 7.  According to Plaintiff, however, at the October 7 meeting Salem had only three objections to the Final Settlement Agreement, two of which were resolved at the meeting.  See Reply, at 3-4.  Plaintiff maintains that the only remaining objection Salem had to the Final Settlement Agreement concerned Salem's "release and carve-out of claims against the FDIC and Salem's sudden desire to include the FDIC as a party to the Settlement Agreement."  Id. at 4.

Following their teleconference on October 7, Salem's counsel sent Plaintiff's counsel an email stating, in relevant part that:

> [I]n my review of Exhibit 1 drafted by attorney Shikuma at the settlement conference in front of the court it was stated that Salem's carveout language for claims against the FDIC fund would be forthcoming from Salem. It was therefore clear that there would be no release against the FDIC but instead a carve out would be in place for Salem to pursue the FDIC. Salem therefore reserves the right to his administrative claim under section 1821D.

Exhibit 1 to Pl.'s Reply.   Plaintiff's counsel responded, noting that Salem's position "makes no sense" because "[i]f there's no release of the FDIC, there's no need for a carve-out."  Exhibit 2 to Pl.'s Reply; see also Pl.'s Reply at 6.

The Parties were unable to resolve their differences and therefore a hearing was held on Plaintiff's Motion to Enforce on October 15, 2013.

## ANALYSIS

A.   <u>Legal Standard for Enforcing a Settlement Agreement</u>

In reviewing an action to enforce a settlement agreement, federal courts are to "appl[y] normal principals of contract law." <u>Makua v. Gates</u>, CIV. 09-00369 SOM, 2011 WL 4625699, at *8 (D. Haw. Sept. 30, 2011).  Further, the "construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." <u>O'Neil v. Bunge Corp.</u>, 365 F.3d 820, 822 (9th Cir. 2004).  Thus, this Court will construe the Parties' Settlement Agreement "according to principles of Hawaii contract law." <u>Boskoff v. Yano</u>, 217 F. Supp. 2d 1077, 1085 (D. Haw. 2001).

"Under Hawaii law, 'Where the evidence in the record shows that **all the essential elements of a contract are present**, a compromise agreement among the parties in litigation **may be approved by the court and cannot be set aside except on grounds that would justify rescission**.'" <u>Edwards v. Trade Pub. Ltd.</u>, CIV. 12-00023 SOM, 2013 WL 1296277, at *3 (D. Haw. Mar. 27, 2013) (quoting

Miller v. Manuel, 9 Haw. App. 56, 63, 828 P.2d 286, 291 (1991)) (emphases added).  "Hawaii courts have stated that, 'in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, **neither party is permitted to repudiate it**.'"  Id. (quoting Miller, 9 Haw. App. at 63, 828 P.2d at 291) (emphases added).  Further, where the parties put the terms of their agreement on the record in open court, there will be no need for an evidentiary hearing on whether an agreement existed or what its terms were. See Doi v. Halekulani Corp., 276 F.3d 1131, 1139 (9th Cir. 2002) (noting that "there was no need for an evidentiary hearing on whether an agreement existed, or what its terms were" as the parties "dispelled any such questions in open court").

B.    **The Parties Entered Into an Enforceable Settlement Agreement**

The Parties do not dispute that the settlement on the record is valid and enforceable.  See Opposition, at 12 ("In this current Motion, my firm respectfully requests the enforcement of the agreed upon Settlement conditions **as exhibited in the Court records**." (emphases added)); Pl.'s Motion to Enforce, at 10 ("In the present case, the Court can immediately enforce the terms of the settlement on the record without having to conduct an evidentiary hearing.").  Indeed, the Court specifically found that the essential terms of a valid and enforceable settlement agreement were set forth in Exhibits 1, 2, and 3 of the term sheets, which is attached to Plaintiff's Motion to Enforce as Exhibits A and B.

Further, there is no need for an evidentiary hearing in this matter as Salem confirmed his agreement to the settlement on the record in response to direct questioning by this Court during the August 26, 2013 settlement conference.  See Exhibit X, at 3 to Pl.'s Mot. to Enforce.  See Doi, 276 F.3d at 1137-38 ("The settlement **contained agreement as to all material terms, which terms were put on the record**. **And in response to direct questioning by the court, Doi stated that she agreed with the terms**. . . . There was no need for the court to engage in factual inquiries to determine whether Doi agreed to be bound by the terms of the agreement. **Any question as to Doi's intent to be bound was answered when she appeared in open court,** listened to the terms of the agreement placed on the record, and when pressed as to whether she agreed with the terms, said 'yeah.'").

Given the foregoing, the Court finds that the settlement on the record is binding on the Parties and therefore this Court can require specific performance in accordance with the terms set forth in the term sheets (Exhibit A and B to Plaintiff's Motion to Enforce).  See TNT Mktg., Inc. v. Agresti, 796 F.2d 276, 278 (9th Cir. 1986); Pavon v. UPS, 2:12-CV-928 JCM NJK, 2013 WL 3367567, at *8 (D. Nev. July 5, 2013); Ebates Performance Mktg. Inc. v. Integral Technologies Inc., 12-CV-06488-JST, 2013 WL 4427115, at *1 (N.D. Cal. Aug. 15, 2013) ("[W]here parties place a settlement on the record, breach of the agreement, **including in refusing to sign a written agreement consistent with the**

**settlement on the record**, may entitle the non-breaching party to **specific**

**performance** or an award of unliquidated damages." (emphasis added)).

C.  **The Final Settlement Agreement is Consistent With the Terms and Conditions in the Settlement on the Record**

The Final Settlement Agreement is attached as Exhibit R to Plaintiff's

Motion to Enforce.  Salem's primary objection to the Final Settlement Agreement

is that it does not contain the "carve out [of] Salem's rights to pursue [his] claims

with the FDIC."  Opposition, at 8.  Salem apparently believes that the Final

Settlement Agreement does not contain a carve-out for Salem to pursue

administrative claims against the FDIC because the Final Settlement Agreement

contains a broad release of claims against the FDIC.  See Opposition, at 8-9.

Salem equates this release with an alleged attempt by Plaintiff to "steal back,

diminish, and confuse [Salem's] rights to Administrative Claims with the FDIC

under 12 USC § 1821(d) . . . ."  Id. at 9 (brackets added).

The Court disagrees with Salem's contentions.  First, as Plaintiff correctly

points out, the settlement on the record expressly incorporated the terms in

Exhibits 1-3 of the Court's record.  Pl.'s Mot. to Enforce, at 7.  Exhibit 1

incorporated all the terms in Mr. Shikuma's August 21, 2013 email to Messrs. Cain

and Leong.  See Exhibit A (Exhibit 1) to Pl.'s Mot. to Enforce.  That email

expressly states that:

> **Salem**, Farrar and the Wagners **release any and all claims they have or may have against** OWB and/or **the FDIC**, and any of their respective affiliates . . . relating to the subject loans and/or Hui and Lower properties, and any claims they could have filed in the foreclosure action or Salem's bankruptcy proceeding, existing from the beginning of time to the date of the settlement.

Exhibit B to Pl.'s Mot. to Enforce (emphasis added).  The carve-out language in Exhibit 3 of the term sheet was just that; a "carve-out" of the general release of all claims Salem had or may have against the FDIC related to the instant Lawsuit and Hui Property and Lower Road Property.  See Black's Law Dictionary (9th ed. 2009) ("carve out, vb. 1. To create an **explicit exception to a broad rule**." (emphasis added)); see also Exhibit 2 to Reply ("David, your email makes no sense. . . . If there's no release of the FDIC, there's no need for a carve-out.").  The language of the "carve-out" makes this point clear:

> Chris Salem reserves the right to **pursue an administrative claim with the FDIC as receiver** pursuant to 12 USC § 1821(d) **for monies the FDIC may recover from third parties for acts or omissions by La Jolla Bank and/or its officers, directors, employees and agents**.

Exhibit A (Exhibit 3) to Pl.'s Mot. to Enforce (emphases added).  Salem admits, that the "hand written notes created by Attorney Shikuma and myself are now **an enforceable record under the authority of the Court**."  Id. (emphases added).[4]

---

[4] The Court assumes that the "hand written notes" referenced in Salem's opposition is Exhibit 3 of the term sheet.  See Exhibit A (Exhibit 3), to Pl.'s Mot. to Enforce.

Indeed, when asked by this Court at the August 26 settlement conference whether he had a chance to review Exhibits 1, 2 and 3 and whether the terms and conditions set forth in Exhibits 1, 2 and 3 were acceptable, Salem responded "Yes, Your Honor."  Exhibit X, at 3 to Pl.'s Mot. to Enforce.  Moreover, contrary to Salem's allegations, the agreed upon carve-out **is** set forth in the Final Settlement Agreement:

> Covered Claims.  For the purposes of this Agreement, except as specifically excluded herein, the term "Covered Claims" shall be defined as any and all claims, demands, complaints, administrative proceedings, causes of action, obligations, liabilities, and damages of any kind, name, nature, or description, either at law or in equity, whether known or unknown, and suspected or unsuspected, which (1) OneWest may have against the Borrowers or the Wagners in connection with the Lawsuit and/or the Properties, including a claim for deficiency judgment against Borrowers but not including OneWest's right to proceed with foreclosure in the Lawsuit under the terms herein; and (2) Borrowers or the Wagners have or may have had against OneWest and/or the Federal Deposit Insurance Corporation (the "**FDIC**"), and any of their respective former or current agents, affiliates, representatives, employees, officers, directors, or attorneys, relating to the Loans or the Properties, and any claims they could have asserted or filed in the Lawsuit or the Bankruptcy Proceeding, existing from the beginning of time to the date of this Agreement; and, (3) Wagners have or may have had against J. RANDALL FARRAR ("Farrar").  For avoidance of doubt, the Covered Claims include, but is not limited to, Salem's potential counterclaims, and all of his complaints and demands to governmental agencies regarding OneWest, the FDIC, the Loans or the Properties, **but does not include (a) Salem's right to pursue an administrative claim with**

**the FDIC as receiver pursuant to 12 USC § 1821(d) for monies the FDIC may recover from third parties for acts or omissions by Original Lender and/or Original Lender's officers, directors, employees and agents[**[5]**]**and (b) the Borrowers' rights, if any, to remediation from OneWest in connection with the Independent Foreclosure Review conducted under the supervision of the Office of the Comptroller of the Currency.

Exhibit R, at 4 § IV(A)(1) to Pl.'s Mot. to Enforce (emphases added).  The "carve-out" for Salem to pursue administrative claims with the FDIC as set forth in the Final Settlement Agreement is exactly what Salem requested at the August 26, 2013 settlement conference.  Salem's argument regarding the scope of the agreed upon carve-out "will not frustrate the enforceability of a settlement agreement nor the fact that it remains binding upon the agreeing parties."  Miller v. Goko Rest. Enterprises, CV 11-00671 JMS-BMK, 2013 WL 1568516, at *4 (D. Haw. Mar. 20, 2013); see also Powell v. Omnicon, 497 F.3d 124, 129 (2d Cir. 2007) ("The settlement remains binding even if a party has a change of heart between the time he [or she] agreed to the settlement and the time those terms are reduced to writing."); Conway v. Brooklyn Gas Co., 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002) ("Once a party agrees to the settlement terms, either orally or in writing, that

---

[5] Significantly, Salem does not argue in his Opposition that the carve-out language in the Settlement Agreement is inconsistent with the settlement on the record.  See Opposition, at 7-9.  In fact it is not.  Except for changing "La Jolla Bank" to "Original Lender" the carve-out language in the Settlement Agreement is **identical** to the language in the settlement on the record.  Compare Exhibit A (Exhibit 3) to Pl.'s Mot. to Enforce, with Exhibit R, at 4 § IV(A)(1) to Pl.'s Mot. to Enforce.

party's later change of heart will not frustrate the agreement's enforceability."); Doi, 276 F.3d at 1141 (holding that a negotiated settlement agreement announced in court becomes binding even if a party has a change of heart after agreeing to its terms).

Salem also briefly argues that the "recitals referenced in the Draft Settlement provided by Salem must be incorporated into the Agreement as they are factual and have direct relationship to the FDIC Administrative Claim."  Opposition, at 10.  As a preliminary matter, the recitals in the Final Settlement Agreement (Section II (A)-(R)) are not material or essential terms to the settlement agreement.  See Boskoff, 217 F. Supp. 2d at1088 (holding that an "essential term" of a settlement agreement is not one that a party views as essential to inducing his or her assent, but rather a term integral to the contract).  Consequently, any disagreement over the recitals will not invalidate the Final Settlement Agreement.  See Assocs. Fin. Servs. Co. of Haw., Inc. v. Mijo, 87 Hawaii 19, 32, 950 P.2d 1219, 1232 (1998) (explaining that "[a] settlement agreement is not invalid because certain details are not worked out, where such details are not essential to the proposal and do not change its terms or purpose").   Based on the evidence provided by Plaintiff, the Court finds that Salem has had ample opportunity to discuss and negotiate adding terms to the recitals.  See Exhibits C-Q and U-V to Pl.'s Mot. to Enforce.  Salem cannot oppose enforcement of the Final Settlement Agreement on that basis and

therefore the Court will leave the recitals set forth in the Final Settlement Agreement undisturbed.

Based on the foregoing, the Court finds that the Final Settlement Agreement is consistent with the material terms set forth in the settlement on the record (Exhibits A and B to Plaintiff's Motion to Enforce).  Further, the Final Settlement Agreement accurately captures the purpose, intent, and material terms of the Parties' settlement on the record.[6]  The Court therefore finds that Salem is required to execute the Final Settlement Agreement (Exhibit R to Plaintiff's Motion to Enforce).

D.    **Plaintiff is Entitled to An Award of Attorneys' Fees and Costs Incurred in Filing its Motion to Enforce**

As part of its Motion to Enforce, Plaintiff requests that this Court exercise its inherent powers and award Plaintiff its attorneys' fees and costs incurred in bringing its Motion as a sanction for Salem's bad faith conduct.  Pl.'s Mot. to Enforce, at 14-16; Reply, at 13-14.  A district court's enforcement power includes the authority to award damages for failure to comply with the settlement agreement.  TNT Marketing, Inc. v. Agresti, 796 F.2d 276, 278 (9th Cir. 1986).

---

[6] Included with Plaintiff's Motion to Enforce is Exhibit W, which is an annotated version of the Final Settlement Agreement.  The footnotes in Exhibit W appear to show that each of the provisions in the Final Settlement Agreement are based on provisions set forth in the settlement on the record, or otherwise provide the mechanics for carrying out the terms of the settlement on the record and/or constitute language standard for settlement agreements of this nature.

Based on the records of this Case and the Court's familiarity with the Parties' settlement discussions, the Court finds that an award of attorneys' fees and costs as a sanction against Salem for his failure to comply with the settlement agreement and his bad faith conduct is warranted.

As Plaintiff correctly points out, Salem does not explicitly address Plaintiff's allegations that Salem acted in bad faith by failing and/or refusing to comply with this Court's orders and/or by failing to provide timely, reasonable and constructive comments to the draft Settlement Agreement and Final Settlement Agreement. Pl.'s Mot. to Enforce, at 14-15; Reply, at 13.  Further, Salem's bad faith conduct is also evident in the Salem Agreement which contains terms contrary to the Parties' settlement on the record.  <u>Compare</u> Exhibits A and B to Pl.'s Mot. to Enforce, <u>with</u> Exhibit V (Salem Agreement) to Pl.'s Mot. to Enforce.  Salem does not address, let alone refute this fact.  <u>See also</u> Shikuma Decl. ¶¶ 28(a) – (d).  Simply stated, Salem purposefully delayed resolution of this matter through his frivolous, untimely and improper actions throughout the Parties' drafting of the Settlement Agreement. <u>See</u> Exhibits C-Q, U-V to Pl.'s Mot. to Enforce.

## <u>CONCLUSION</u>

In accordance with the foregoing, the trial date and final status conference in this matter is HEREBY VACATED and the Court HEREBY FINDS AND

RECOMMENDS that Plaintiff's Motion to Enforce Settlement Agreement, filed on October 1, 2013, be GRANTED IN FULL as follows:

1. Salem shall execute and deliver the Final Settlement Agreement (Exhibit R to the Motion to Enforce) within three business days of the District Court's adoption of these recommendations and entry of the order;

2. Salem shall execute and deliver exhibits 1, 2, 3, 4, 6, and 8 (which are attached to Exhibit R) within three business days of the District Court's adoption of these recommendations and entry of the order;

3. Salem shall show proof of funds and proof that such funds are not from the Bankruptcy Estate within three business days of the District Court's adoption of these recommendations and entry of the order;

4. Salem shall pay to Wagner $50,000.00 for their release of lien on the Hui Road property;

5. Salem shall pay to Plaintiff $575,000 for the Lower Road Property;

6. Salem shall pay Plaintiff's reasonable attorneys' fees and costs incurred in bringing its Motion to Enforce.  Plaintiff shall submit proof of its fees and costs pursuant to LR 54.3; and

7.    The Court will retain jurisdiction to ensure Salem's compliance with the District Court's adoption of these recommendations and entry of order.

IT IS SO FOUND AND RECOMMENDED.

DATED:  Honolulu, Hawaii, October 31, 2013.



Kevin S.C. Chang
United States Magistrate Judge

<u>OneWest Bank, FSB vs. J. Randall Farrar; et al.;</u> Civil No. CV 12-00108 ACK-KSC; FINDINGS AND RECOMMENDATION GRANTING PLAINTIFF ONEWEST BANK, FSB'S MOTION TO ENFORCE SETTLEMENT AGREEMENT